
EOD
03/20/2013

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STANLEY THAW, | § | Case No. 11-43603 |
| | § | (Chapter 7) |
| Debtor. | § | |

## MEMORANDUM OPINION REGARDING
## TRUSTEE'S OBJECTION TO EXEMPTIONS

This case is before the Court on the Objection to Homestead Exemption (the "Objection") filed by Christopher Moser, acting as trustee for the chapter 7 estate (the "Trustee"). The Objection seeks to disallow the exemption claimed by Dr. Stanley Thaw (the "Debtor") for his lavish home in Frisco, Texas.[1] The Debtor agrees that his exempt homestead interest is capped at $146,540 by 11 U.S.C. § 522(p). The Debtor, however, denies that he engaged in any intentional fraud that would entirely extinguish his exempt interest in his home under 11 U.S.C. § 522(o). The Debtor asserts that money from the companies he controlled found their way into his home as a result of a fortuitous (for him and his spouse) business decision by a builder who had received payments from the companies for an unrelated construction project. In addition, the Debtor's spouse seeks to establish that she has an exempt interest in their homestead that is not capped by § 522(p) or otherwise reduced or extinguished by § 522(o).

The Court has jurisdiction over the Objection, which the Court heard on July 24, 2012, and September 5, 12 and 18, 2012, in accordance with 28 U.S.C. §§ 1334 and 157. This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §

---

[1] The Objection also contains an application for turnover of the all interests held by Kernell Thaw in HBO2 Works, LLC, HBO2 Works Houston, LLC, HBO2 Works San Antonio, LLC, and HBO2 America, LLC. At the hearing on July 24, 2012, the parties announced that the application for turnover would be tried in a separate adversary proceeding.

1

157(b)(2)(A), (E) and (O).  The Court's findings of fact and conclusions of law follow. *See* FED. R. BANKR. P. 7052.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The State Court Lawsuit Against the Debtor

The Debtor filed for bankruptcy after his former business partner obtained a final judgment against him.  He stated in his bankruptcy schedules that he is retired and that his wife, Kernell Thaw, is self-employed and earns $20,000 per month from the operation of her businesses.  Kernell did not join the Debtor's bankruptcy petition.

The Debtor married Kernell in 2001.  In 2002, the Debtor and Dr. Leslie Schachar, a childhood friend, entered into a partnership.  They formed a medical service company called Theramedics, Inc. ("Theramedics"), which entered into a series of loan transactions and equipment leases secured by their personal guaranties.  Theramedics provided patients with hyperbaric oxygen therapy, among other things.

In 2004, Theramedics defaulted on an equipment lease agreement, and the lessor sued the Debtor, Schachar and Theramedics.  In 2006, Theramedics defaulted on a note and security agreement in the principle amount of $360,000.  Theramedics then ceased doing business and dissolved.

Schachar personally paid off the balances due on the note and equipment lease. He obtained assignments of the Debtor's guarantees with respect to these debts and demanded payment from the Debtor.  The Debtor refused to pay his portion of the guaranteed indebtedness.  In May 2008, Schachar sued the Debtor, and he received a final judgment in his favor in November 2009.  The Amarillo Court of Civil Appeals affirmed the judgment in July 2011, and the Texas Supreme Court denied the Debtor's

2

petition for review in November 2011. The Debtor and Kernell were aware of Schachar's lawsuit and its procedural posture at all relevant times.

### B. The HBO2 Companies

As Theramedics was defaulting on its equipment lease agreement, in or around June 2004, the Debtor and Kernell signed and filed documents with the Texas Secretary of State, forming HBO2 Works, LLC. Kernell allegedly held a majority interest in the company and the Debtor managed its operations, according to the documents admitted at trial. The original place of business was their residence in Plano, Texas.

HBO2 Works opened a clinic in Denton, Texas, in or around July 2005 and moved to Hurst, Texas, in or around 2006. HBO2 Works provided patients with hyperbaric oxygen therapy. In 2008 and 2009, as Schachar's suit was proceeding to a final judgment against the Debtor, the Debtor and Kernell signed and filed documents with the Texas Secretary of State, forming HBO2 Houston, HBO2 America, and HBO2 San Antonio. Kernell – again, allegedly – held a majority interest in the companies while the Debtor managed their operations, according to the documents admitted at trial.

Kernell testified at the hearing on the Objection that she contributed her separate property, specifically some of the $25,000 she received from the sale of her pre-marital residence in Nevada, to form HBO2 Works. Kernell testified that she may have received more than $25,000 from the sale of her residence but could not recall how much more she might have received or where that money might have been deposited. She also testified that HBO2 Houston, HBO2 America, and HBO2 San Antonio belonged to her because they were spun off from her first company, HBO2 Works.

Kernell's vague testimony about her financial contributions to the businesses was not credible or supported by the documentary evidence. The tax returns reflect that HBO2 Works, HBO2 Houston, HBO2 America, and HBO2 San Antonio were not funded with capital contributions by Kernell or the Debtor but, rather, by borrowing. The personal tax returns filed by the Debtor and Kernell also reflect that Kernell described herself as a "housewife" during the relevant time period. Although Kernell claimed to be the businesses' owner and operator at the hearing on the Objection, Kernell has no medical background, she did not understand the relationships between the various businesses she claimed to own, and she had no personal knowledge of the businesses' operations. The Debtor was in charge of the HBO2 businesses and their operations at all material times.

### C. The Lavish Dream Home

At or around the time that Schachar received a final summary judgment in his favor, the Debtor and Kernell decided to build what Kernell described as her dream home in Frisco, Texas, which would have five bedrooms, six-and-a-half baths, and 7,776 square feet of living space. Axxium Custom Homes Dallas, LLC, executed a contract for the sale of the property to the Debtor and Kernell for $1,750,000 on October 28, 2009. On November 1, 2009, however, the Debtor and Kernell entered into a Contract for Deed increasing the purchase price by $400,000 to $2,150,000. Kernell could not explain the increase in the price of her dream home at the hearing on the Trustee's Objection. The cost of her dream home was more than four times the value of the merely very nice home where she and the Debtor lived in Plano, Texas.

The Contract for Deed required monthly payments of $26,000. In the year-and-a-half after signing the Contract, the Debtor and Kernell siphoned money from the HBO2 companies into their homestead. The Debtor and Kernell made monthly payments to Axxium of more than twice the contractually required amount, for total payments of $1,089,888.02, between November 1, 2009 and June 27, 2011. Kernell and Stanley Thaw paid $191,400 of this total amount. The balance was paid by Stanley Thaw from bank accounts he controlled and used as his personal checking accounts, though the accounts were ostensibly held by HBO2 Works, HBO2 America, HBO2 Houston and HBO2 San Antonio.

Although the Debtor received his last paycheck from HBO2 Works in August 2010, he continued to exercise control over the HBO2 companies' accounts. He wrote nearly two dozen checks and made other transfers to Axxium from the HBO2 companies' accounts during and after August 2010. Indeed, the Debtor signed all of the checks from the companies' accounts to Axxium after August 2010.

Kernell testified that, in addition to building their dream home, the Debtor hired Axxium to build a hyperbaric sports facility in Las Vegas for the HBO2 companies. She testified that the Debtor had the authority to contract with Axxium and write checks to Axxium from the companies' accounts as her employee. The Debtor continued to write checks to Axxium even after his alleged employment ended in August 2010. Kernell had never seen a written agreement with Axxium or its owner, Ali Manteghi, and she did not know exactly what services Axxium or Ali Manteghi were to provide with respect to the Las Vegas facility. She did not participate in the negotiation of the purported agreement with Axxium and had no knowledge of it other than what the Debtor told her. She did

not know whether the Debtor had entered into a written agreement with Axxium relating to the construction of the Las Vegas facility.

According to Kernell, the checks from the HBO2 companies to Axxium were to pay for the home Axxium was building in Frisco as well as for Axxium's services relating to the Las Vegas facility. The only evidence that Axxium provided any services relating to the Las Vegas facility was Kernell's testimony, which the Court did not find credible inasmuch as her testimony was vague and not based on her personal knowledge. There was no evidence that Axxium was qualified to provide construction services relating to a hyperbaric facility in Nevada and no credible evidence that Axxium actually provided any services relating to the facility.

On June 27, 2011 – the day after the Texas court of appeals affirmed the trial court's judgment in favor of Schachar – the Debtor and Kernell closed on the purchase of Kernell's dream home for $2,150,000.[2] They financed their purchase with a mortgage loan from Regions Bank in the principle amount of $1,000,000.

Although the HUD-1 Settlement Statement stated that the Debtor and Kernell had paid $1,133,195.70 to Axxium and were paying an additional $167,265.99 in cash, the Debtor and Kernell entered into a secret transaction with Axxium to funnel some of the loan proceeds back to the Debtor. On the same date as the closing, June 27, 2011, the Debtor and Kernell executed documents in which they purported to borrow $164,450 from Axxium secured by a second lien on their home. Mr. Manteghi instructed that the title company was not to record the Second Lien Deed of Trust. He also submitted a

---

[2] According to an appraisal obtained by Regions Bank, the property was worth $1,790,000 as of May 27, 2011.

letter instructing the title company to credit the Debtor and Kernell with a payment to Axxium of $1,133,157.90 for the purchase of the home.

In his response to the Objection, the Debtor states that Axxium made a "business decision" to allow all of the money paid to Axxium, including money allegedly paid for building the Las Vegas facility, to be used as a down payment for the purchase of his homestead.  The Debtor did not present any evidence in support of this characterization of Axxium's instruction to the title company.  The Debtor and Kernell signed the Settlement Statement when they closed on the purchase of their new home and they understood that all of the money they and the HBO2 companies had paid to Axxium was being used to create equity in their home.

The Court finds, based on the credible evidence admitted at the hearing on the Trustee's Objection, all of the payments to Axxium were intended to be used, and were in fact used, by the Debtor and Kernell as part of a scheme to place assets beyond Schacher's reach by funneling money into the extravagant home Axxium was building for them.

**D. The Debtor's Claim of Exemption**

On December 2, 2011, the Debtor filed a bankruptcy petition under chapter 7 of the United States Bankruptcy Code (the "Code" or "Bankruptcy Code").  In the schedules filed by the Debtor along with his petition, he listed his residence located in Frisco, Texas, as exempt from creditors such as Schacher under § 522(b) of the Code.  The Debtor based this exemption on the homestead provisions of the Texas Constitution and the Texas Property Code.  *See* TEX. CONST. art. XVI, §§ 50 and 51; TEX. PROP. CODE §§ 41.001–.002.

7

The Trustee filed a timely Objection to the Debtor's homestead exemption, which the Debtor and Kernell opposed. The Debtor did not testify at the hearing on the Trustee's Objection. In his written response to the Objection, the Debtor stipulated that the Trustee had established the elements of § 522(p) and, therefore, that his homestead exemption is capped at $146,450. The Trustee sought to establish at the hearing that the Debtor's homestead exemption should be entirely disallowed pursuant to § 522(o) of the Code, because the Debtor acquired the homestead with the intent to hinder, delay or defraud his creditors, specifically, Schachar. The Trustee also argued that Kernell does not enjoy a homestead exemption separate and distinct from that of the Debtor.

Kernell testified at length in opposition to the Trustee's Objection to the Debtor's claim of exemption. Kernell asserted that the home where she lives with the Debtor is community property. She argued that, under Texas law, her interest in her home is a vested property right similar to a life estate, which cannot be taken away from her without just compensation. She further argued that she is entitled to 82.77% of the proceeds of any sale of the home as just compensation for her homestead interest.

## II. LEGAL ANALYSIS

As an initial matter, a chapter 7 bankruptcy petition creates an estate to satisfy creditors' claims. The estate consists of "all legal or equitable interests of the debtor in property" when the petition is filed was well as all interests of the debtor's spouse in community property "under the sole, equal or joint management and control of the debtor." 11 U.S.C. §§ 541(a)(1), (a)(2)(A). Thus, in this case, the filing by the Debtor of an individual bankruptcy petition created an estate which encompasses *community*

*property* that was under the Debtor's joint management and control as of the date of the petition. *Id*. § 541(a)(2)(A).

Kernell does not dispute that the property in which she claims a vested homestead right is community property, because it was acquired during her marriage to the Debtor. TEX. FAM. CODE § 3.002. The home was subject to the Debtor's joint management and control and so entered his bankruptcy estate. TEX FAM. CODE § 3.102(c). *See Carlton v. Estate of Estes,* 664 S.W.2d 322, 323 (Tex. 1983) (per curiam) (stating that "a spouse's interest in community property subject to joint management, control, and disposition"). In exchange for the inclusion of community property in the bankruptcy estate, any discharge received by the Debtor will be effective against community creditors of Kernell as well as those of the Debtor. 11 U.S.C. § 524(a)(3). A discharge will enjoin community creditors from seeking to collect on community debts from the after-acquired community property of either spouse. *Id.*

The entry of the home into the Debtor's bankruptcy estate gave the Debtor the exclusive right to claim exemptions therein. 11 U.S.C. § 522(b). The Debtor agrees that Code § 522(p) caps his homestead interest at $146,450. Kernell, however, argues that her community property interest in the homestead is not limited by the Bankruptcy Code. Thus, the issues the parties have presented for the Court to decide are (i) whether the Trustee has established grounds to deny the Debtor's claimed homestead exemption in its entirety pursuant to § 522(o) and (ii) whether or to what extent Kernell's community property interest in the home is limited by Code §§ 522 (o) and (p).

A.   **Burden of Proof**

Rule 4003(b) of the Federal Rules of Bankruptcy Procedure provides that any party in interest may object to a debtor's exemption claims within thirty days after the conclusion of the meeting of creditors held under Rule 2003(a). In response to such an objection, a debtor is not required to make an affirmative showing that a claimed exemption is appropriate in response to such an objection. A claim of exemption is presumptively valid, *see* 11 U.S.C. § 522(l), and a debtor need only characterize the claimed exemption as falling within an exempt category. *See, e.g., In re Lester,* 141 B.R. 157, 161 (S.D. Ohio 1991). The objecting party, to meet its burden, must then produce evidence which "rebuts the prima facie effect of the claimed exemption." *Id. See also* FED. R. BANKR. P. 4003(c).

B.   **Kernell's Homestead Interest**

In her response to the Trustee's Objection, Kernell claims to possess a "vested property right" in her homestead under Texas law, akin to a life estate, separate and apart from the interest of the Debtor. Kernell cites *United States v. Rodgers,* 461 U.S. 677 (1983) for the proposition that her homestead right did not enter the bankruptcy estate, since she did not join the Debtor's petition, and the Trustee may not abridge her homestead right without just compensation. In *Rodgers*, the Supreme Court considered the federal government's power to foreclose homestead property attached by a federal tax lien. *Rodgers* held that § 7403 of the Internal Revenue Code empowers a district court to order the sale of a family house in which a delinquent taxpayer has an interest, even though a nondelinquent spouse also has a homestead interest in the house under state law. *Rodgers*, 461 U.S. at 698-700. The Supreme Court determined there was no "gratuitous

confiscation" in *Rodgers* because compensation was paid to the nondelinquent spouse. *Id.* at 697-698.

*Rodgers* dealt exclusively with the Internal Revenue Code. *Rodgers* is also distinguishable from the present case in that *Rodgers* involved the use of community property to pay a separate debt whereas the present case involves the inclusion of community property in the bankruptcy estate to pay community debts. *See* 11 U.S.C. § 541(a)(2)(A) and (b). Consistent with *Rodgers*, the Bankruptcy Code codifies the respective right of a debtor and the debtor's spouse to proceeds of community property. If community property is to be sold under the Bankruptcy Code, the nonbankrupt spouse has a right of first refusal, *see id.* at § 363(i), and if the spouse does not exercise that option, the trustee must distribute the proceeds of sale in proportion to the respective interests of the estate and the spouse, *see id.* at § 363(j). *See also Matter of Tsunis,* 39 B.R. 977, 980 (E.D.N.Y. 1983), *aff'd,* 733 F.2d 27 (2d Cir. 1984) (per curiam) (discussing *Rodgers* and upholding the constitutionality of a sale of community property under § 363).

Kernell's argument about her homestead interest confuses an interest in property with the protection of that interest from creditors. The homestead protection is afforded under Texas state law to protect debtors from the claims of creditors. *See* TEX. CONST. art. XVI, § 50; *see also* TEX. PROP.CODE § 41.002. It does not create a vested property interest that would provide an argument for compensation. *See In re Rogers,* 513 F.3d 212, 224 (5th Cir. 2008). As explained recently by the Fifth Circuit, "[u]nder Texas law, '[t]he homestead interest is a legal interest created by the constitution that provides prophylactic protection from all but [a few] types of constitutionally permitted liens

11

against homesteads. This interest ... gives protective legal security rather than vested economic rights.'" *Id.* (quoting *Heggen v. Pemelton,* 836 S.W.2d 145, 148 (Tex. 1992)).

Furthermore, it is without debate that only Congress can establish laws on bankruptcy. To the extent the Texas homestead exemption conflicts with §§ 522(o) and (p), federal law governs by virtue of the Supremacy Clause.[3] Lien avoidance, for example, is not limited by state exemptions. *See, e.g., In re Maddox,* 15 F.3d 1347, 1351 (5th Cir. 1994). "[T]he state's ability to define its exemptions is not absolute and must yield to conflicting policies in the Bankruptcy Code." *In re Weinstein,* 164 F.3d 677, 683 (1st Cir.1999).

Kernell's argument that she has a separate, vested homestead property right that did not enter the Debtor's estate, and that is not subject to the limits provided by Bankruptcy Code §§ 522(o) and (p), has been rejected by at least three other courts in Texas. *See H.D. Smith Wholesale Drug Co. v. McCombs (In re McCombs),* 2007 WL 4411909 (Bankr. S.D. Tex. Dec. 17, 2007) (reversed on other grounds); *Douglass v. Langehennig, et al. (In re Douglass)*, 2008 WL 2944568 (Bankr. W.D. Tex. July 25, 2008) (following *McCombs*); *Dome Entertainment Center v. Kim (In re Kim)*, 405 B.R. 179 (Bankr. N.D. Tex. 2009) (following *McCombs*). *But cf. In re Walsh*, 359 BR 389 (Bankr. D. Mass. 2007) (reasoning that debtor's non-debtor spouse could claim $500,000 homestead exemption under Massachusetts law; consequently, the debtor's Chapter 13

---

[3] The Supremacy Clause of the United States Constitution states that

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

12

plan took into account the full State exemption and not just the cap of § 522(p) to which the debtor was subject and still complied with the "best interest test" of § 1325(a)(4), *i.e.*, creditors would still receive at least what they would receive in a hypothetical Chapter 7 case).

The bankruptcy court in *McCombs*, after considering arguments similar to the Kernell's here, held that "the [Bankruptcy] Code does not recognize [the non-debtor wife's] claim to a homestead exemption separate and distinct from the Debtor." *Id.* at *8. Only the Debtor may exempt property that has become property of the estate, which "effectively eliminates the rights of a non-debtor spouse to manage and control community property." *In re Kim*, 405 B.R. at 187 (quoting *In re Rodriguez,* 353 B.R. 144, 149 (Bankr. N.D. Tex. 2006)). "The Bankruptcy Code makes no provision for a non-debtor to claim an exemption from the estate." *Id.* at 187-88 (quoting *In re Duncan,* 294 B.R. 339, 344 (10th Cir. BAP 2003)). There is also no provision for compensation for the non-filing spouse's property interest. *Id.* (citing *In re McCombs,* 2007 WL 4411909 *7; *In re Lang,* 191 B.R. 268, 272 (Bankr. D. Puerto Rico 1995)).

For these and all the foregoing reasons, the Court concludes that Kernell has no separate and distinct exempt homestead interest in the home in Frisco, Texas, that would allow her to claim a homestead exemption or entitle her to compensation or prevent the sale of the homestead by the Trustee except as set forth in the Bankruptcy Code. The Debtor admits that § 522(p) caps the homestead exemption he claims in this case. The Court now turns to the question of whether the Trustee has established grounds for disallowing the entirety of the Debtor's homestead exemption under § 522(o).

### C. 11 U.S.C. §§ 522(o)

Congress added § 522(o) to the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse and Consumer Protection ("BAPCPA"). Section 522(o) applies to real or personal property that the debtor or a dependent of the debtor uses as a residence or claims as a homestead. Section 522(o), in pertinent part, states as follows:

> [T]he value of an interest in real or personal property that the debtor or a dependent of the debtor uses as a residence ... or ... claims as a homestead shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10–year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o). Here, the Debtor disputes that he acted with the intent to hinder, delay or defraud his creditors. He also disputes that he used his non-exempt community property to acquire equity in his homestead, asserting, instead, that Axxium made a business decision to credit the funds it had received from the HBO2 businesses for the Las Vegas facility to the Debtor's personal obligation to pay Axxium for the construction and sale of his homestead.

Because direct evidence of a debtor's intent is usually unavailable, courts may infer actual intent from circumstantial evidence. Courts have looked to decisions interpreting §§ 548(a)(1) and 727(a)(2) when evaluating intent to defraud under § 522(o). *In re Cipolla*, 476 Fed. Appx. 301, 306, (5th Cir. 2012). In *Cipolla*, for example, the bankruptcy court looked to the non-exclusive indicia of fraud listed in the Texas Uniform Fraudulent Transfer Act ("TUFTA"):

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;

14

  (3) the transfer or obligation was concealed;
  (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
  (5) the transfer was of substantially all the debtor's assets;
  (6) the debtor absconded;
  (7) the debtor removed or concealed assets;
  (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
  (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
  (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
  (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COMM. CODE § 24.005(b).

  Here, days after a state court entered a summary judgment against the Debtor, the Debtor and his spouse entered into an agreement with Axxium to build an opulent dream home that would cost approximately four times the value of their existing home. Several days later, for no apparent reason, the Debtor and his spouse agreed to increase the price of the home by $400,000. Over the course of the next year-and-a-half, the Debtor and his spouse made monthly payments to Axxium that were, on average, more than twice the amount due under their agreement to purchase the home.

  The Debtor paid Axxium for his homestead with more than $1 million from his own accounts and the accounts of the HBO2 companies. Schacher was pursuing the Debtor to collect the Debtor's portion of the guaranteed indebtedness of Theramedics at that time. The Debtor attempted to conceal his actions from Schacher by claiming that some of the payments to Axxium were made by the HBO2 companies to pay Axxium for services relating to a Las Vegas sports facility. The Debtor, however, failed to present credible evidence that he had engaged Axxium to provide any services in connection with

the Las Vegas facility, that Axxium was qualified to provide such services, or that any of the payments to Axxium were in exchange for an actual service provided by Axxium with respect to the Las Vegas facility.

The preponderance of the evidence shows that the Debtor concocted an elaborate scheme to funnel non-exempt assets into his exempt homestead in a way that would be difficult for creditors such as Schacher to detect or trace. The Debtor structured the HBO2 companies for this purpose, and he had unfettered access to the HBO2 companies' bank accounts even though the accounts were held in the names of the companies. The Debtor's decision to purchase an expensive dream home at around the same time that Schacher obtained a judgment against him, the funneling of money into the dream home, the shadiness of the Debtor's dealings with Axxium, the numbers that never quite add up, the approximately $160,000 that Axxium gave back to the Debtor at closing, and the Settlement Statement showing that Axxium applied all of the money it had received from the Debtor, including money that was supposedly meant to pay for Axxium's services with respect to the Las Vegas facility, to the Debtor's indebtedness relating to his homestead, are all indicative of the Debtor's intent to defraud. The Court, therefore, concludes the requirements of § 522(o) are met and Debtor's homestead exemption should be reduced to $0.

### III. CONCLUSION

For all the foregoing reasons, the Trustee's Objection is sustained. The Court will enter a separate order consistent with this Memorandum Opinion.

Signed on 3/20/2013

_Brenda T. Rhoades_    SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE